**CONTINENTAL CASUALTY COMPANY,**
**Appellant,**

v.

**Eleanor P. BOCK et al., Appellees.**

No. 13609.

Court of Civil Appeals of Texas.

Houston.

Nov. 10, 1960.

Rehearing Denied Dec. 1, 1960.

The Kempers, John D. Richardson, Houston, for appellant.

L. Sanborn McDowell, Floresville, for appellee Eleanor P. Bock.

Fulbright, Crooker, Freeman, Bates & Jaworski, Newton Gresham, Houston, for appellee David E. Rose.

**WERLEIN, Justice.**

This suit was brought by appellee, Eleanor P. Bock, against appellant, Continental Casualty Company, to recover death benefits provided in a Vacation, Business Travel (V.B.T.) accident policy, and for reformation of such policy, issued by appellant to appellee's husband, Henry C. Bock, who thereafter was killed in a military aircraft crash. Part VI, entitled "Exclusions", of the V.B.T. policy excluded from coverage any "loss, fatal or non-fatal, caused by or resulting from * * * (2) injury sustained while or in consequence of riding in or on any vehicle or device for aerial navigation except as a passenger, in (a) any aircraft being used for transportation purposes only, having a 'standard' air-worthiness certificate issued by the Civil Aeronautics Administration of the United States of America * * or (b) a transport type aircraft operated by the Military Air Transport Service (MATS) of the United States * * *."

The plane in question was a Lockheed TV-2 jet aircraft belonging to and under the jurisdiction of the U. S. Navy. It had no air-worthiness certificate and was not a transport type of aircraft operated by MATS. The pilot of the plane was a naval reserve officer who was making the flight as an accommodation to Col. Bock and to maintain his flying status and rating. The flight was authorized by the U. S. Navy for training and experience to be acquired by the pilot. Appellee sought recovery on alleged grounds of mistake, fraud and estoppel, alleging that appellant's agents made an affirmative representation that the policy would contain no exclusions of military aircraft, and appellant was estopped to assert such exclusions. Appellant brought Alex H. Bullock and David E. Rose into the suit as third party defendants, seeking indemnity from them in the event appellee should recover. At the conclusion of the evidence, the third party defendants moved for directed verdicts, which were granted. The trial court entered judg-

ment upon the jury verdict in favor of appellee against appellant.

Appellant complains that there is no evidence and insufficient evidence to support the jury's findings to Special Issues Nos. 21, 19 and 19–A to the effect (1) Bullock, Bock's insurance broker and agent, was not negligent in failing to read the policy delivered to him covering the insured, Bock, and (2) that the exclusions contained in the policy were written therein as a result of a mutual mistake by and between (a) Bullock and Rose, appellant's general agent, and (b) Bullock and Alice Salinas, Rose's secretary, and therefore the court erred in overruling appellant's motion for judgment non obstante veredicto. It thus becomes necessary to review and analyze the testimony and the evidence pertaining to such issues. Bullock talked twice to Rose by telephone and once to Mrs. Salinas by telephone and once to her in person when he picked up the policy for delivery to Bock. Rose did not remember any talks at all with Bullock. Hence, we are relegated largely to the testimony of Bullock and Mrs. Salinas.

Bullock, an experienced recording or local insurance agent with over twenty years' insurance experience, testified in substance that in May, 1956 Bock, a retired Marine Corps Colonel, contacted him for the purpose of securing passenger insurance coverage on a contemplated flight in a military plane from Houston to Quantico by way of Washington; that since he did not write that kind of insurance, he telephoned Rose, appellant's general agent in Houston, who gave him a "quotation" on rates; that thereafter on or about Thursday, November 8, 1956 (the May flight having been cancelled) Colonel Bock called him again, advising him he was contemplating a flight on November 14 in a Marine Corps Beechcraft to Dallas and from Dallas to Willow Run, Michigan, in a military jet and asking him if he could still give him some coverage, and if so he would get verification of the flight over the weekend and let him know Monday; that

he, Bullock, thereupon contacted Rose who assured him that it was still possible to get the coverage; that he informed Rose the flight was being made in a military plane and that he was positive he told him it was a jet plane because he had it in his notes. Bullock also testified to the effect that the additional information he gave Rose in November as to the time the plane would depart and the day of return and the names of the parties was on the "larger note sheet" which he used to refresh his memory, and that the "smaller" note or memorandum on which the word "jet" was used was not written until the morning of November 12, 1956, at which time he first learned from Bock that the plane from Dallas was to be a jet. This was several days subsequent to his last conversation with Rose.

Bullock further testified that after Bock called him Monday morning, November 12, telling him he had confirmation that the flight would be made, he called Rose's office, and since Rose was not there, he talked to the girl in the office (Mrs. Salinas) telling her the flight he had discussed with Mr. Rose was going to take place and for them to issue the policy and he would pick it up; that he picked up the policy at Rose's office about 4:30 that afternoon, and at the same time left a check to cover the net amount owing on the premium after deducting his own commission. The coverage in the policy was to begin November 14. After picking up the policy, Bullock took it to his office and mailed it to Bock that evening without reading it.

Bullock testified that he relied upon the superior knowledge of Rose, and that he told Rose the policy was to cover a military aircraft and was assured by Rose that he could provide it. He said he needed to give Rose only the pertinent information required to write the policy and that he did not go into detail in discussing any exclusions in the policy and that Rose made no reference whatever to any exclusions.

When Bullock told Mrs. Salinas that Col. Bock was going ahead with his flight and to prepare the policy, Mrs. Salinas started to ask for some information about the trip and he told her Mr. Rose had all of the information. Bullock was not sure whether he told Mrs. Salinas it was a jet plane. Mrs. Salinas testified that the word "jet" was never used and had she known it was a jet plane she would not have issued the policy. He testified that other than the fact that it was a military plane and not a private craft or a commercial airline, there was nothing else to discuss unless Mrs. Salinas or Mr. Rose asked the information, because he did not underwrite the policy. He presumed that Rose had discussed the policy with Mrs. Salinas. He also testified that when Mrs. Salinas tried to tell him something, he told her he wanted the policy that he had talked to Mr. Rose about. He did not know that Bock was going in a jet trainer plane and didn't think that Bock knew what kind of plane it was other than it was a military jet plane and he was going as a passenger.

With respect to the conversation between Bullock and Mrs. Salinas, she testified that Bullock didn't go into any details but told her that it was some type of service plane, although he didn't use that word, but that was the impression she got; that she knew it wasn't a commercial plane; and that when she questioned Bullock to find out a little more, he told her that he had already discussed it with Mr. Rose, so that was the end of her questioning. At another point she testified that she said, "I said, 'well, just a moment,' I said, 'you know the policy has certain exclusions on that.' He said, 'Well, it's all right. I have discussed it with Mr. Rose. see.'" That was the end of her conversation with him.

Mrs. Salinas further testified that she had sold a lot of V.B.T. policies each month, and that she had no permission from the company or authority to change the policy in any way and could not write any policy to cover an airplane trip other than the one written; that she wanted to go over the exclusions with Bullock and get the details as to what the trip involved, but then after he told her that he had talked the thing over with Rose, she was completely satisfied. Rose didn't mention the trip to her and she made no attempt to confirm with Mr. Rose whether Bullock had talked to him. When Bullock told her he had talked to Mr. Rose, that was the end of it, and she went ahead and took the information and wrote the policy.

Mr. Rose testified that he had authority to issue only standard policies for the usual passenger transportation, and that he had a form for that type of policy which was furnished by the company. The evidence shows that Mrs. Salinas, who was Rose's secretary, wrote practically all of the accident, health and hospitalization policies that were written in Rose's office, and such policies were handled through her. Rose testified that he was not familiar with the type of aircraft operated by MATS.

The evidence further shows that the policy which was mailed to Bock by Bullock reached Bock's residence on the afternoon of November 14 when he was not at home; that when he arrived home at about 5 o'clock he inquired whether the policy had come and was informed by his wife that it had; that Bock had only about half an hour to change his clothes and leave for the airport, and that he did not open the envelope or examine the policy; and that Mrs. Bock opened the policy that evening after Bock left but didn't examine it carefully.

Appellant contends that Bullock was the agent of Bock, and that the plaintiff cannot recover because Bullock's failure to read the policy constituted negligence as a matter of law, and that therefore the court erred in refusing to instruct a verdict in favor of appellant and in refusing to enter judgment non obstante veredicto. We are of the opinion that appellee's witness, Bullock, was acting as agent for Bock as an insurance broker, and not as appellant's agent.

No issue was submitted as to Bullock's agency, but the case was tried and submitted on the theory that Bullock was Bock's agent. Bock did not deal directly with appellant's agent, Rose. He had no communication with him. Bullock testified that he did not claim to have been an employee or agent of appellant with respect to accident insurance; that Bock was one of his policyholders for whom he had previously written a fire and extended coverage policy on household goods; that when Bock called him in May, 1956 with respect to flight insurance, the agreement was that he would report back to Bock; that Bock requested him to get the insurance, and that when Bock called him he didn't know where he would place it. Bullock further testified that he had been in the insurance business since 1935 and that Bock gave him instructions to get the insurance for him, stating that if he didn't get the insurance he did not want to make the flight.

The law is well settled that where the policy is issued at the instance of and is delivered to the insured through an intermediary or broker who collects the premium and shares in the commission paid thereon by the insurer, such intermediary is the agent of the insured. 24–B Tex.Jur., p. 236, Insurance, Sec. 96; East Texas Fire Ins. Co. v. Brown, 1891, 82 Tex. 631, 18 S.W. 713; Automobile Insurance Co. of Hartford, Conn. v. Buie, Tex.Civ.App., 252 S.W. 295.

We have carefully examined the record to determine whether there is any evidence of probative force which will support the jury finding to Special Issue No. 21, that Bullock was not negligent in failing to read the policy which he picked up for delivery to Bock. Bullock was an experienced insurance agent holding himself out as offering "personalized insurance, programmed to fit *your* needs." He testified that he knew what the Military Air Transport Service was and had general knowledge of Civil Aeronautics Air-worthiness Certificates, but that he did not mention either to Rose. When Mrs. Salinas undertook to tell him about certain exclusions in the policy, he stopped her, saying he had talked to Rose. Bullock did not contradict Mrs. Salinas' testimony with respect to exclusions although he did testify that he did not talk to Rose about any exclusions and Rose didn't mention any to him. He further testified that when he picked up the policy on November 12 he did not have time to look at it because of the sizeable volume of his business and his secretary working overtime, and further that his secretary immediately invoiced the policy, prepared an envelope, weighed it and mailed the policy to Bock that evening; that the coverage was to begin on the evening of November 14; and that when he picked up the policy on the afternoon of November 12, he "didn't even bother to open it and look at it to see if he got what he ordered."

It probably would not have taken Bullock five minutes to open the envelope and read the policy and observe the exclusions which were in bold type. He knew that the flight would not take place until the following Wednesday, November 14. He had Monday evening and all of Tuesday and Wednesday morning in which to deliver the policy. It may be that Colonel Bock did not have an opportunity to read the policy because of his haste to get to the airport, but certainly his agent, Bullock, had ample time to examine it. His excuse for not doing so was that he was too busy.

It is our view that under the facts of this case it was Bullock's duty to Bock to examine the policy and make sure proper coverage was provided. Diamond v. Duncan, Tex.Civ.App., 138 S.W. 429, affirmed 107 Tex. 256, 172 S.W. 1100; Burroughs v. Bunch, Tex.CivApp., 210 S.W.2d 211, writ ref.; Derby v. Blankenship, 1950, 217 Ark. 272, 230 S.W.2d 481. Ordinarily an insured cannot purchase, receive and retain a written policy of insurance and then be permitted to say that he did not read it or know its contents and provisions, unless the

insurer did something to induce the insured not to read the policy. The rule applies to the insured's agent who has an opportunity to inform himself as to the contents of the policy, and the agent's negligence in failing to examine the policy is imputed to the insured and his beneficiary. Bock relied upon his own agent and not on any company agent.

■ There is no evidence that at the time of or subsequent to the delivery of the policy anything was said or done, fraudulently or innocently, that was calculated to prevent either Bullock or Colonel Bock from reading the policy and learning its terms. We think, therefore, that the insured and those in privity with him are bound by the plain unambiguous provisions of the policy as written regardless of the negotiations and conversations prior to the actual delivery thereof which fell short of any definite oral agreement as to insurance coverage. 24–B Tex.Jur. 78, Insurance, Sec. 23, and authorities cited. Appleman, Insurance Law and Practice, Sec. 173, states: "The insured is under a positive duty to read the contract delivered to him, and he will be presumed to have done so. By acceptance and retention, therefore, without objection to the terms thereof, the insured is precluded from stating that he did not know the terms thereof or did not intend to accept the contract in that form." In American National Ins. Co. v. Huey, Tex.Com.App., 66 S.W.2d 690, 691, the court said: "It is the settled law of this state that ordinarily the provisions of an insurance contract are binding on the insured whether he has read the policy or not." It is true that in the Hucy case the agent was merely a soliciting agent. In the present case, Rose was a general agent, but the evidence is undisputed he had no power to bind appellant on any type of short term accident policy except in strict accordance with the printed provisions of the V.B.T. policy in question, and that he had to submit for approval of the home office any other type of short term accident coverage. Mrs. Salinas who wrote the policy was not a general agent. She had no authority to write any flight coverage policy other than the V.B.T. policy issued.

Supporting the rule of law that an insured who accepts and retains a written policy and his beneficiary are bound by the plain provisions thereof and will not be heard to claim the policy was different from that promised, are Aetna Ins. Co. v. Holcomb, 89 Tex. 404, 34 S.W. 915; Aeronautical Corporation of America v. Gossett, Tex. Civ.App., 117 S.W.2d 893; Texas Prudential Ins. Co. v. Howell, Tex.Civ.App., 119 S. W.2d 1100; Drogula v. Federal Life Ins. Co., 248 Mich. 645, 227 N.W. 692.

In Sublett v. World Ins. Co., Tex.Civ. App., 224 S.W.2d 288, 290, the Court stated that the insured "was bound as a matter of law to examine the policy received within a reasonable time after it came into her hands * * * or be held to have accepted the policy as satisfying her application." See also Rudd Paper Box Co. v. Rice (Ontario Ct. of App.), 3 Dominion Law Reports (1912) 253, in which the insureds' agent forwarded the policy to plaintiffs without reading it, and the court held that it was his duty to read it and to obtain a valid policy.

Had the examination of the policy been made by Bullock within a reasonable time, that is, prior to the beginning of the flight and Bock notified of the lack of coverage for the particular trip, he could have cancelled the flight or perhaps procured other insurance which would have afforded coverage.

In the present case Bullock did not use that care which an ordinarily prudent, skilled, experienced and competent insurance agent would have used in behalf of Bock. Indeed, he exercised no care, as indicated by his testimony, that he "didn't even bother to open it and look at it." Moreover, he exercised no care when he refused to let Mrs. Salinas explain the exclusions in the policy on the assumption that Rose had talked to her, although the exclu-

sions were never mentioned between him and Rose.

The cases relied upon by appellee are distinguishable. In Barker **v.** Travelers' Ins. Co., Tex.Civ.App., 52 S.W.2d 285, writ dism., Barker while purchasing a passenger ticket to California was asked by the ticket agent if he wanted to purchase a 2-day trip insurance policy. The agent informed Barker that the policy which cost 50 cents provided injury and death benefits, but he did not tell Barker, who was 80 years of age, that it excluded a person older than 70. Barker paid the 50 cents and the agent put the policy in an envelope with Barker's ticket. Barker had no time to read the policy as the train was about to leave. The court held that under such circumstances the age exclusion was waived. In Aetna Ins. Co. of Hartford, Conn. v. Brannon, 99 Tex. 391, 89 S.W. 1057, 2 L.R.A., N.S., 548, the court held that where both the agent and the insured agreed on a contract different from that expressed in the writing, and the insurance agent in delivering the policy to the insured stated it was all right, the insured's failure to read the policy and discover the mistake would not preclude him from having the mistake corrected. In Manland v. Houston Fire & Cas. Ins. Co. of Ft. Worth, Tex., 274 F.2d 299, the U. S. Court of Appeals, 9th Cir., held that where there was a mutual mistake the insured was not barred under the applicable law of the State of Washington from seeking reformation by reason of his failure to read the policy. In Henry v. Southern Fire & Cas. Co., Tenn.App., 330 S.W.2d 18, it was held in effect that if the agent of the insurance company who was familiar with the entire operation and business practice of the insured, assured them of full liability coverage, the company would be estopped to rely upon an exclusion clause in the policy as a defense although the assured failed to read the policy. These cases are inapplicable to the instant suit in which Bock had no negotiations with any agent of appellant. He relied upon his own agent, Bullock, who as an experienced insurance agent was charged with the duty of examining the policy and ascertaining whether it provided coverage.

The present case is distinguishable from those cases which hold that where one fills out an application for insurance, he has a right to rely upon the insurance company issuing a policy conforming to the written application, or where one renews a policy, he may rely upon such policy containing the same terms as the old policy, or where an order is placed to increase the amount of coverage, the insured may rely upon the insurance agent doing so without inserting co-insurance provisions in the policy. In such cases, the insured's failure to read the policy does not constitute such negligence as will preclude relief in equity. Automobile Ins. Co. of Hartford, Conn. v. United Electric Service Co., Tex.Civ.App., 275 S.W.2d 833, writ ref., n.r.e.

■ We are of the opinion that there is another reason why appellee may not recover in this suit. In order to recover, it was necessary for appellee to prove that the policy as written was due to a mutual mistake or to a unilateral mistake induced by appellant's agents. 36 Tex.Jur. 750, Reformation, Sec. 19.

■ The purpose of reformation is to make the written contract speak the oral agreement, that is, "to adjust the instrument to the actual conditions of fact and make it effective to carry out the purpose which the parties supposed they had expressed." 36 Tex.Jur. 713. "An actual agreement reached prior to the drafting of the instrument involved is essential to reformation, for, as has already been said, the court is without power to make a contract which the parties did not make." Ibid. 724.

In Marlin Associates v. Trinity Universal Ins. Co., Tex.Civ.App.1950, 226 S.W.2d 190, 193, the court quoted with approval the following statement: "Reformation is a proper remedy when the parties have reached a definite and explicit agreement, understood in the same sense by both, but, by-

their mutual or common mistake, the written contract fails to . express this agreement." Black on Rescission and Cancellation (1916), Sec. 11.

■ In the present case we find no evidence of any definite and explicit agreement between Bullock and Rose or between Bullock and Mrs. Salinas that the policy would be other than the one issued. The policy as issued covered military aircraft transporting passengers, provided such aircraft had an air-worthiness certificate or was a transport operated by MATS. When Bock called Bullock on November 8, advising him that he was contemplating a flight from Houston to Willow Run, Mich., in a military plane, and asking if he could still give him some coverage, and stating that if he could do so, he, Bock, would get verification of the flight over the weekend and let Bullock know on Monday, Bullock immediately telephoned Rose and was assured by Rose that it was still possible to get coverage. At such time Bullock gave Rose the usual data such as the names of the parties, the dates of departure and return, and destination. It was not then at all certain that the flight would be made as it had not been verified or confirmed and would not be until some days later. It was not then known that the plane would not have an air-worthiness certificate or be operated by MATS. Hence, there was no definite, explicit agreement between Bullock and Rose that the policy would be issued or. if later issued, as to its provisions. Bullock merely inquired concerning coverage. He did not enter into an oral agreement with Rose to prepare a policy covering a trip which had not as yet been confirmed or verified, nor did Rose agree to write such policy although he assured Bullock airplane coverage could be provided. Bullock never talked to Rose thereafter, and never entered into any oral contract with him authorizing issuance of the policy nor did he so much as confirm the contemplated trip.

On November 12 Bock called Bullock and for the first time confirmed the flight. Whereupon Bullock contacted Rose's office and in the absence of Rose talked to Mrs. Salinas and asked her to prepare the policy that he had talked to Rose about. He did not give her any details concerning the policy other than the data necessary to fill in appellant's regular form of airplane policy. When she tried to tell him that the policy contained certain exclusions, he cut her off and refused to discuss the matter. Mrs. Salinas, being assured by Bullock that he had talked with Rose, filled out the V.B.T. policy, being the only one that she was authorized to write. She was led to believe by Bullock that the policy she prepared was the one that would provide the desired coverage. There was no definite and explicit agreement between Bullock and Mrs. Salinas covering any policy other than the one issued.

■ The law is well settled that "the mistake must have occurred through the reduction of the understanding and agreed intent of the parties to writing, so that the instrument does not represent their real agreement * * *." 36 Tex.Jur. 745; Clemmens v. Kennedy, Tex.Civ.App., 68 S.W.2d 321, error ref.; Riggs v. Willis, Tex.Civ.App., 36 S.W.2d 263, error dism. There may have been a misunderstanding between Bullock and Rose, and between Bullock and Mrs. Salinas during their negotiations, but a misunderstanding or mistake occurring during the making of the oral contract is not a ground for reformation. It merely avoids the agreement. Callihan v. White, Tex.Civ.App., 139 S.W.2d 129; Sun Oil Co. v. Bennett, 125 Tex. 540, 84 S.W.2d 447. See 36 Tex.Jur. 722, where it is stated: "Mistake preventing mutuality of assent or destroying the factum of the contract may be pleaded defensively, but that, like rescission, avoids the contract and is therefore inconsistent with reformation."

■ Bullock's mistakes consisted in assuming that Rose and Mrs. Salinas had discussed the policy, in assuming that the policy would contain no exclusions, in failing to contact Rose after confirmation of the flight on November 12, in failing to permit Mrs.

Salinas to tell him of the exclusions, and in failing to ascertain and to advise Rose and also Mrs. Salinas that the flight would be in a trainer plane without an air-worthiness certificate and not operated by MATS. We think it was Bullock's duty and responsibility to ascertain and advise Rose of the nature of the flight since Bullock was the only one who was in contact with Bock. Such mistakes occurred during the negotiations, thereby preventing the parties from entering into any definite, explicit oral contract which might form the basis for reformation of the policy. Moreover, Bullock's mistakes were unilateral mistakes which will not afford relief unless the other party induced them. 36 Tex.Jur. 750, Reformation, Sec. 19, and authorities cited; Hayman v. Dowda, Tex.Civ.App., 233 S.W.2d 466. There is no evidence that Rose or Mrs. Salinas induced Bullock to make such mistakes. Hence appellee had the burden of showing by clear, convincing and satisfactory proof that any mistake relied upon was a mutual one. New York Life Ins. Co. v. Street, Tex.Civ.App., 265 S.W. 397, error ref.; 36 Tex.Jur. 784. See 29 Tex.Jur. 720, Mistake, Sec. 12, and authorities cited.

▮▮▮ Bullock advised Mrs. Salinas in effect that the plane would be a military plane and she prepared and delivered a policy which did cover military aircraft, unless excepted by the exclusions. There is no evidence that Bullock ever communicated to Rose or Mrs. Salinas any information about the plane or flight which would indicate that the policy issued would not cover it. There is no evidence that either Rose or Mrs. Salinas ever had in mind or agreed to write any other policy than the usual V.B.T. policy which was the only kind they had authority to write, and which would cover a military flight if the plane was a transport operated by MATS or had an air-worthiness certificate. There was simply no meeting of the minds of the parties. Rose testified that he had sold hundreds of similar policies and the policy in question was the only type of trip policy he sold or had authority to sell. Mrs. Salinas

testified she knew the policy Bullock was talking about because she had just the one policy and that she knew the aircraft of MATS were not excluded, and she had an understanding of the meaning of the term "Civil Aeronautics Authority Air-worthiness Certificate." It is the law that military planes are subject to the rules of the Civil Aeronautics Board if there are no Army or Navy regulations to the contrary. United States v. Causby, 1946, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206.

The jury finding that Rose made affirmative representations to Bullock that the policy when written would contain no exclusions has no support in the evidence. The jury also found that any representation made by Rose to Bullock was not intended to mislead or deceive Bullock and that Rose did not intentionally induce Bullock to accept the written policy without reading it. No issues of fraud, misrepresentation or concealment by Mrs. Salinas were submitted, nor is there any evidence of concealment, fraud, misrepresentation or other inequitable conduct on the part of either Rose or Mrs. Salinas. In Lander Lumber Co. v. Williams, Tex.Civ.App., 250 S.W.2d 317, 319, ref., n. r. e., the court stated: "In the absence of fraud or inequitable conduct a written instrument will not be reformed on account of mistake unless the mistake is mutual; that is, a mistake common to both parties, both laboring under the same misconception in respect to the terms of the instrument. Sun Oil Co. v. Bennett, 125 Tex. 540, 84 S.W.2d 447, loc. cit. 450, and authorities there cited." Hayman v. Dowda, supra.

▮▮▮▮ We find no evidence in the record giving rise to either estoppel or waiver, which are independent grounds of recovery or of defense. No issues of estoppel or waiver were requested or submitted. They were, therefore, waived. John Hancock Mutual Life Ins. Co. v. Esparza, Tex.Civ. App., 286 S.W.2d 695, ref., n. r. e.; Grantham v. Anderson, Tex.Civ.App., 211 S.W.2d 275; Rule 279, Texas Rules of Civil Procedure. Moreover, waiver and estoppel can-

not create new rights. They merely preserve existing ones. Southland Life Ins. Co. v. Vela, 1949, 147 Tex. 478, 217 S.W.2d 660.

In considering the testimony in the record from the standpoint most favorable to appellee, as we must do, we have concluded that there is no evidence of probative force supporting the findings of the jury to Special Issues Nos. 21, 19 and 19–A, and that the Trial Court erred in not granting judgment non obstante veredicto in favor of appellant. Burt v. Lochausen, 1952, 151 Tex. 289, 249 S.W.2d 194. In view of our holding, it is not necessary to discuss appellant's other Points of Error.

The judgment of the Trial Court, insofar as it decrees that appellee recover against appellant, is reversed and rendered, and insofar as it decrees appellant take nothing against David E. Rose and Alex H. Bullock is undisturbed.